IN THE UNITES STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Case No. 24CR271 |
| | ) | |
| v. | ) | Judge Manish S. Shah |
| | ) | |
| | ) | |
| KIRK BRIDGES | ) | |

**DEFENDANT KIRK BRIDGES' SENTENCING MEMORANDUM**

Defendant KIRK BRIDGES, by and through the Federal Defender Program and its attorney, KATHLEEN LEON, respectfully submits the following memorandum outlining potentially relevant sentencing factors. Mr. Bridges has pled guilty to being a felon in possession of a firearm and possessing a firearm in furtherance of a drug trafficking crime. Having pleaded guilty, he accepts responsibility for his actions. He understands the Court will sentence him to a period of incarceration. Mr. Bridges asks only that his sentence be no greater than necessary to accomplish the purposes set forth in the sentencing statute. 18 U.S.C. § 3553(a).

Accordingly, Mr. Bridges is requesting a sentence of 120 months. Considering the factors set forth below, a sentence of 120 months is sufficient, but not greater than necessary to achieve the purposes of sentencing. In support, Mr. Bridges respectfully states as follows:

### DISCUSSION

As this Court is aware, after *Booker*, the United States Sentencing Guidelines are merely "advisory," and sentencing courts are required to consider all of the factors

1

listed in 18 U.S.C. § 3553(a) in imposing a sentence. *U.S. v. Booker*, 543 U.S. 220, 245 (2005). After considering the factors, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with" the purpose of sentencing. 18 U.S.C. § 3553(a) (emphasis added). This parsimonious provision serves as the "overarching" command of the statute. *See Kimbrough v. U.S.*, 552 U.S. 85, 101 (2007).

## I. Objections to the Advisory Guidelines

In the Presentence Report, the Probation Office calculated a combined adjusted offense level of 26. The Probation Office then subtracted three levels for acceptance of responsibility, yielding a total offense level of 23. When combined with Mr. Bridges' criminal history category of VI, this resulted in an advisory guideline range of imprisonment of 152-175 months (92 to 115 months + 60 mandatory consecutive months). The Probation Office has determined that Mr. Bridges is a career offender, his career offender guideline as determined by the Career Offender table under 4B1.1(c)(3) is 262-327 months. Mr. Bridges does not object to the advisory guideline calculation contained in the PSR and he seeks a guideline sentence of 120 months, which results in the longest period of continuous incarceration that has ever been imposed on Mr. Bridges and meets the goals of sentencing.

## II. Objections to the PSR

Clarification and context gained through counsel's notes, taken during the Presentence Report Interview will be added in Section III(A)(1).

### III. A Sentence of 120 Months' Imprisonment in the Bureau of Prisons is Sufficient, but Not Greater Than Necessary, to Satisfy the Statutory Sentencing Objectives.

#### A. Who is Kirk Bridges and Nature and Circumstances of the Offense - 18 U.S.C. § 3553(a)

**1. Kirk's childhood was nothing short of traumatic.**

Born on October 5, 1985, in Chicago, Illinois, Kirk Bridges entered this world under circumstances no child should endure. From the moment of his birth, Kirk faced adversity: he was prenatally exposed to crack cocaine—commonly referred to as a "crack baby" in the medical and legal lexicon of the late 20th century. Though stigmatized at the time, we now understand that such children are more likely to experience long-term developmental, emotional, and behavioral challenges due to both the biological impact of in utero drug exposure and the chronic instability that often surrounds their upbringing. Studies confirm that children prenatally exposed to cocaine are at higher risk for conduct disorders, attention deficits, and substance use later in life, particularly when raised in environments marked by poverty, neglect, or trauma.[1]

Kirk's early life was marred by exactly these conditions. His father, absent and uninvolved, left behind little more than a name. His mother, Deborah Thomas, struggled with drug addiction and mental illness throughout his youth. Unable to provide a stable home, she left Kirk in the care of his maternal grandmother, Mary

---

[1] Frank DA, Augustyn M, Knight WG, Pell T, Zuckerman B. Growth, development, and behavior in early childhood following prenatal cocaine exposure: a systematic review. JAMA. 2001;285(12):1613-1625.

3

Thomas—a working-class woman who did her best but could not shield him from the grip of poverty. Kirk recalls going to school simply to get a meal, wearing unwashed clothes, and giving up his share of food so his sisters could eat first. "We were impoverished for sure," he said. "I wasn't neglected, but I didn't have everything I needed." Among the everything he didn't have that he needed was a hot meal every single night, clean clothing, and sometimes heat and lights – the most basic of necessities.

Despite his grandmother's unconditional love, Kirk's childhood was not safe. He endured physical and emotional abuse at the hands of his uncle, who told him he was worthless, and whose violence forced Kirk back into a fragile family arrangement. At 12 years old, Kirk was arrested for the first time and sent to Chicago's now-shuttered Audy Home,[2] where he was subjected to repeated sexual abuse by counselors—individuals who were charged with protecting him but instead compounded his trauma. Until now, Kirk has never spoken in detail about this abuse to anyone. *See* Donne, M. D, et el. Barriers to and facilitators of help-seeking behavior among men who experience sexual violence. American Journal of Men's Health, 12(2), 189–201. https://doi.org/10.1177/1557988317740665 ("Regarding sexual minority men, gender roles (e.g., that men should be strong), male rape myths (e.g., that men cannot be raped) were often impediments to help seeking and disclosure").

---

[2] Adams, Andrew. Nearly 200 people allege decades of 'systematic' abuse at youth jail in Chicago. https://www.wglt.org/illinois/2024-07-24/nearly-200-people-allege-decades-of-systematic-abuse-at-youth-jail-in-chicagostematic' abuse at youth jail in Chicago | WGLT

That trauma continued. At Kemmerer Village, another facility for troubled youth, Kirk was again sexually abused by a staff member. Despite reporting the abuse, he was dismissed, and no one believed the "troubled kid." These repeated violations of trust formed the bedrock of Kirk's psychological distress—a history that has never been properly addressed or treated. With no one to turn to, Kirk instead numbed his distress with substances. By 15 or 16, he witnessed the murder of a classmate who had defended him from bullying. The trauma triggered a mental health crisis and a brief hospitalization, but treatment was superficial and unsustained. "I used to feel useless," Kirk shared. "I've grown out of it. I feel happy—but I'm not happy that I'm in this situation." The tragic life events Kirk has been forced to navigate - in part due to circumstance out of his control – do not act as an excuse but add context into the life of a man who, starting from the day he was born, had the odds stacked against him.

Like many children born into generational poverty, instability and who suffer from childhood sexual abuse, Kirk's introduction to substance use came early—and it came not as recreation, but as relief. By age 11 or 12, he was smoking marijuana. By 13, alcohol. By 16 and suffering from multiple forms of psychological trauma, he had moved on to cocaine, LSD, and Ecstasy. These were not the choices of a carefree adolescent. These were the desperate attempts of a child—one who had already endured sexual abuse, parental abandonment, poverty, hunger, and violence—to dull the noise of pain and fear that surrounded him daily. Kirk never had a childhood free from adult burdens. There was no consistent caregiver to guide him through

5

adolescence, no mental health professional to help him process what had been done to him, and no community investment in his healing. The juvenile justice system had failed him in the worse way possible. He did what so many traumatized young people do: he numbed himself. Drug use became a crutch—one he leaned on to silence the intrusive memories of abuse and the constant pressure of survival.

Over the years, Kirk's addiction took root in the silence. He used nearly daily from his late teens through adulthood, with brief interruptions only when incarcerated. Upon release – lacking community-based support, access to consistent therapy, or employment – he always fell back into substance use: self-medication in its most dangerous form that led to self-sabotaging dangerous behavior. Studies confirm that individuals with complex trauma histories are at significantly greater risk for substance use disorders, often using drugs not to "get high" but to self-soothe the lingering effects of abuse, poverty, and psychological pain.[3] "My financial state, to cope with life," he said plainly when asked what triggered his drug use. Importantly, Kirk never denied the toll his addiction took. He acknowledges it cost him family trust, his freedom, his health, and his peace of mind. He stated plainly, "It hasn't gotten me anywhere in life." He has reached a point—after decades of turmoil—where he no longer sees drugs as a solution. He sees them as a dead-end.

As studies from the National Institute on Drug Abuse confirm, long-term recovery from substance use disorder is most successful when treatment is coupled

---

[3] SAMHSA, "Trauma and Justice Strategic Initiative."
https://www.samhsa.gov/trauma-violence/types.

with family support, a safe living environment, and structured reentry planning—all of which Kirk now has access to.[4] Tools that United States Probation can and do offer. What he needs is the chance to put these tools to work—in the community, with supervision, structure, and support. He is no longer the teenager looking to escape through chemicals. He is a father, a son, and a man looking to be accountable not just for his past, but for his future.

Even while enduring cycles of incarceration, Kirk showed resilience. He earned his GED while in custody and enrolled in vocational training in auto mechanics and cosmetology—fields in which he still hopes to work. He has no delusions about the damage his past behavior caused. "I got my shit together," he said frankly. "I don't need [drugs] to cope. I just want to do better in life. I want to be a better role model for my daughters." Kirk's two teenage daughters, Gia and Jasmine, are thriving. Their mother, a correctional officer, co-parents with Kirk, and he maintains a close relationship with both girls. He also remains in regular contact with his grandmother and sisters, who support him emotionally and spiritually. His grandmother has even offered to house him upon release. "He's not a bad young man," she said. "He respects his elders."

Kirk bears the physical scars of his environment as well. He was shot in the leg several years ago and still lives with chronic pain and reduced mobility. Yet, despite this, he continues to push forward with hope. He finds joy in simple,

---

[4] National Institute on Drug Abuse. "Principles of Drug Addiction Treatment: A Research-Based Guide (Third Edition)." https://nida.nih.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition.

constructive activities: cutting hair, drawing, working on cars. He dreams of a future where he's no longer defined by what was done to him or by the mistakes he made while trying to survive. He hopes speaking to licensed professionals while on supervised release will help him unpack some of his trauma so he can fully clear his path forward in life.

While the law must respond to his conduct, it should also consider the context that gave rise to it—a context marked by trauma, deprivation, and systemic failure from birth. Kirk Bridges is not asking for a pass, and the tragic life events Kirk has been forced to navigate do not act as an excuse, but it adds context to a man who, from birth, had all the odds stacked against him. In truth, Kirk stood no chance of having a productive adult life unless he unpacked all the baggage and trauma he had been carrying since he was just a child – trauma he has only just begun to address. *See* Swogger, Marc T., et al. "Childhood Abuse and Harmful Substance Use Among Criminal Offenders." Addictive Behaviors, vol. 36, no. 12, 2011, pp. 1205–12, https://doi.org/10.1016/j.addbeh.2011.07.025. ("Childhood abuse is [] associated with harmful substance use, which exacerbates other emotional, behavioral, and interpersonal problems. Indeed, substantial literature has identified links between childhood physical and sexual abuse and later substance use problems); *see also id.* ("The prevalence of both childhood abuse and the harmful use of alcohol and other drugs is particularly high among criminal offenders, and both factors have been proposed to increase risk for criminality").

    **2. Kirk has been focused on looking forward and improving himself.**

Kirk only began unpacking these extremely traumatic life events in the last year, giving him a new perspective on his life and his actions. Kirk regrets not getting the help he needed earlier or opening himself up to someone sooner. More importantly, Kirk regrets allowing his personal fear, addiction and pain to manifest in a way that compromised not only his safety but the safety of others.

Kirk intends on changing the trajectory of his life for the betterment of himself, his children, and his fiancée Diamond Freeman. Kirk's current relationship with Diamond represents a turning point in his life—an anchor after years of instability. For the past several years, Diamond has been a positive presence, offering Kirk the kind of consistent support he lacked throughout his life. Even after learning about his past and the trouble he has gotten himself into at the start of this case – she remains that steady presence. The two are engaged and have spoken seriously about building a future together grounded in stability, honesty, and accountability. Diamond wants to see him succeed—not just for her, but for his daughters, his family, and himself. She sees Kirk beyond his mistakes, and she is prepared to help him walk the hard road toward transformation.

### B. The Need for both General and Specific Deterrence is met by imposing a 120-month term of imprisonment – 3553(a)(2)(B)

If this Court would like to send a message to others to not possess firearms as a felon and refrain from distributing drugs, Mr. Bridges is already doing this. There is no evidence that the severity of punishment influences general deterrence. The deterrence literature has been reviewed several times by groups of scientific experts

9

at the request of sentencing policymakers. "[I]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity." Thus, there is no basis to infer that increasing Mr. Bridges' sentence to a degree greater than necessary will send the message that crime does not pay. The mere fact of Mr. Bridges' arrest and conviction sends the message that if you are a felon in possession of a firearm and if you are putting drugs out into this community, you will be caught and you will be punished.

As for specific deterrence, Mr. Bridges has taken the time to understand his past, present, and future. He is presently determined to relinquish the traumas of his past to create a positive future for himself, his soon-to-be wife, his grandmother, children and society. Mr. Bridges takes responsibility for where he currently is in life and understands that he must change. And to do so, he acknowledges that he must seek therapy for the trauma he has endured throughout his life – namely in the system as a child. A sentence of 120 months is sufficient to serve the goals of punishment and specific deterrence, particularly in Kirk's case, where his conduct is deeply rooted in untreated trauma and long-term addiction. Further incarceration beyond this point risks diminishing returns, especially in a Bureau of Prisons system that continues to suffer from severe staffing shortages in critical areas like mental health and substance abuse treatment. The Department of Justice has acknowledged that BOP vacancies for psychologists and drug treatment staff regularly exceed 40%,

leaving many inmates without meaningful access to care.[5] Kirk does not need more time in a facility that cannot meet his therapeutic needs; he needs structured, community-based treatment and supervision upon release. A 120-month sentence balances accountability and the need punishment with the realistic opportunity for rehabilitation.

## IV. The Court Should Consider the Hardship of Pretrial Custody at Kankakee County Jail.

Since his arrest and up to about three months ago, Mr. Bridges has been detained at the Kankakee County Jail. It is relevant that his conditions of confinement have been particularly poor. The Seventh Circuit has held that a sentencing court may properly consider the harshness of the prison conditions in fashioning a just sentence. *See United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007).

Mr. Bridges feels strongly that conditions at Kankakee Jail are materially worse than at the Metropolitan Correctional Center ("MCC"). For instance, individuals at the MCC are permitted outdoor time at least once a week, and there are windows through which inmates may see the outdoors. At the Kankakee facility, there is no outdoor recreation time at all. There are no windows accessible to inmates in the facility. At the MCC, individuals are regularly allowed in-person visits, at no cost to the inmate. At Kankakee, there are no in-person visits at all. To

---

[5] Office of Inspector General, U.S. Department of Justice, Review of the Federal Bureau of Prisons' Medical Staffing Challenges, Evaluation and Inspections Report 16-02 (Mar. 28, 2016).

11

make matters worse, inmates and their families are charged exuberant amounts of money for phone calls with family. In contrast, at the MCC inmates are given roughly 300 minutes of calls at no cost. Further, inmates at the MCC are permitted to take part in programming that are meant to aid in their growth. At Kankakee, programming is limited and requires a tablet that inmates must pay to access. As a result, Mr. Bridges contends that his pretrial time has been harsher than that of other similarly situated detainees in the Northern District.

## V. The Proposed Conditions of Supervised Release

Mr. Bridges finds all the conditions of supervised release acceptable and necessary while he forges a new path forward for himself, with the help of United States Probation, post-incarceration.

## CONCLUSION

Mr. Bridges acknowledges the harm that he has done to those involved in the crime, his loved ones, and himself. He acknowledges that there is no escaping the consequences he has willfully caused. However, he also has come to terms with the reality of his life, and that he must change to thrive. An examination of the paragraphs above shows that a sentence of 120-months of imprisonment is sufficient punishment in this case. Wherefore, based on the sentencing factors and arguments set forth above, Mr. Kirk Bridges respectfully requests that this Court impose a sentence of 120 months in the custody of the Bureau of Prisons to be followed by a 5-year term of supervised release. Such a sanction is sufficient, but not greater than necessary, to satisfy the statutory sentencing objectives in his case.

        Respectfully submitted,

        FEDERAL DEFENDER PROGRAM
        John F. Murphy, Executive Director

    By: *s/ Kathleen Leon*
      KATHLEEN LEON
      Attorney for Kirk Bridges

KATHLEEN LEON
Federal Defender Program
55 E. Monroe Street, Suite 2800
Chicago, IL 60603
(312) 621-8300

## CERTIFICATE OF SERVICE

  The undersigned, <u>Kathleen Leon</u>, an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**DEFENDANT KIRK BRIDGES' SENTENCING MEMORANDUM**

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>August 1, 2025</u>, to counsel/parties that are non-ECF filers.

        By: <u>*/s/ Kathleen Leon*</u>
           KATHLEEN LEON
           FEDERAL DEFENDER PROGRAM
           55 E. Monroe St., Suite 2800
           Chicago, Illinois 60603
           (312) 621-8341